SCHOOL ADMINISTRATIVE DISTRICT NO. 1, et al.,

v.

COMMISSIONER, DEPARTMENT OF EDUCATION.

Supreme Judicial Court of Maine.

Argued Jan. 25, 1995.

Decided June 7, 1995.

---

Peter Cary and Robert E. Mittel (orally), Mittel, Asen, Eggert, Hunter & Cary, Portland, for plaintiffs.

Peter H. Stewart (orally), Asst. Atty. Gen., Augusta, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

WATHEN, Chief Justice.

The plaintiffs, eighty-three school administrative districts and three students, appeal from a judgment of the Superior Court (Kennebec County, *Mills, J.*) denying their equal protection challenge to the constitutionality of funding reductions implemented pursuant to the School Finance Act. 20–A M.R.S.A. §§ 15601–15621 (1993 & Supp.1994). Finding no error, we affirm the judgment.

### The Act's Funding Formula

The Act provides a method for sharing the cost of public education between the state and local school units. The statutory formula is complex, but essentially it provides for a foundation level of spending per pupil that is based on the average of the actual local operating costs of all school units in the state, separated into elementary and secondary students. 20–A M.R.S.A. §§ 15603(13), 15605(2)(A), 15607(1). The total allocation for a particular school unit, the foundation level multiplied by the number of pupils, is apportioned between the state subsidy and the local share. 20–A M.R.S.A. §§ 15609, 15610. The Commissioner of Education each year recommends to the Legislature a total state expenditure for education and the associated statewide mill rates to be used in the funding calculations. 20–A M.R.S.A. § 15605. The local share of the operating costs, for example, is calculated by applying the mill rate set by the Legislature each year and the state property valuations for each

municipality. 20–A M.R.S.A. §§ 15607(2), 15609.

The result of the funding formula is best illustrated by a simplified hypothetical. We assume that there are two school units with the same number of pupils. The municipalities in School Unit A have one million dollars in property valuation while those in Unit B have two million in property valuation. Multiplying the statewide mill rate by each unit's property valuation results in a *local share* for operating costs for School Unit A that is one-half that of Unit B. A unit with less property value per pupil generates fewer dollars from the mill rate used in calculating the local share and thus receives a proportionately higher state subsidy than a unit with higher property values per pupil. It follows that a unit with a proportionately higher state subsidy would lose proportionately more funding from a percentage reduction in the state subsidy.[1]

*Plaintiffs' Challenge to Funding Reductions*

In fiscal years (FY) 1991 through 1994, reductions in the state subsidy occurred as a result of the state's inability to pay the total sum recommended by the Commissioner of Education. The Legislature reduced the to-tal state expenditure primarily on a percentage basis, and amended the Act to reduce each school unit's subsidy by the same percentage.[2]

Plaintiffs brought an action against the Commissioner of Education challenging on the ground of equal protection the percentage funding reductions made in the state subsidies.[3] At trial, plaintiffs challenged the manner in which the available funds for education were distributed. They did not challenge the adequacy of the education in their school units. Testimony at trial principally involved comparisons of the equity or fairness of the school finance system after the funding reductions compared to the equity before the reductions.[4] Plaintiffs' expert witness, Dr. James Guthrie, presented a series of equity measurements to determine disparities in per pupil revenues. He concluded that Maine's school finance distribution had become substantially less equitable over the period of funding reductions. Defendant's expert witness, Dr. John Augenblick, who examined equity using expenditure data, could not draw a conclusion that the funding reductions had an impact on the equity of the funding system. The court found that the challenged amendments implementing the

1. Other parts of the funding formula address sharing of program costs (including the costs of transportation and special education) and debt service costs (principal and interest costs for state-approved school construction), and various adjustments to the state share of the allocation. 20–A M.R.S.A. §§ 15605(2), 15608(2), 15609(1)(B), 15610(1)(B), 15611, 15612. The Act allows some local choice as to raising and expending additional local appropriations beyond that necessary to meet the local share requirement under the funding formula. 20–A M.R.S.A. § 15614(3).

2. The actual reductions in the state subsidy may be summarized as follows: In FY'91, the Legislature reduced the state share by about $12.2 million, as compared to the recommended level, using a 2.299% reduction, 20–A M.R.S.A. § 15602(4), 15610(1)(C), and later made a further reduction of $1.9 million accomplished by a 0.388% reduction, P.L. 1991, ch. 121, pt. A, § A–9. In FY'92, the Legislature reduced funding of the state share by about $70.8 million corresponding to a 13.008% reduction, 20–A M.R.S.A. § 15602(5), 15610(1)(E), and later reduced the state share by an additional $16 million accomplished in part by a straight percentage funding reduction of one-half of 3.41%, § 15602(6),

15610(1)(F). The Legislature, in FY'93, essentially froze funding at the prior year's level, with certain exceptions. 20–A M.R.S.A. § 15602(7). In FY'94, the Legislature reduced the subsidizable base year costs (the operating costs for the second year before the year of allocation) of school units by 18.82% before employing the funding formula, thereby reducing the state and local share by the same amount. 20–A M.R.S.A. § 15603(26–A). In that year, the Legislature also enacted a 50% subsidy cushion. 20–A M.R.S.A. § 15602(8). School units with greater state subsidies in FY'94 compared to '93 would have one-half of the excess deducted while units with lesser subsidies in FY'94 would have one-half the difference added to the FY'94 subsidy.

3. In the Superior Court, plaintiffs also challenged the minimum state allocation, 20–A M.R.S.A. § 15613(13), the low-income student adjustment, § 15612(12), and the hold harmless clause, § 15613(12) (repealed by P.L. 1993, ch. 410, § F–19) in the Act.

4. The experts at trial testified that equity is one goal of a successful school finance act. Other goals include adequacy, liberty or local choice, and efficiency.

funding reductions were constitutional, and entered a judgment for defendant. Plaintiffs appeal.

### Equal Protection

Plaintiffs contend that the straight percentage reduction enacted by the Legislature violates the plaintiffs' right to equal protection under the Maine Constitution. They argue that education is a fundamental right, and that, therefore, strict scrutiny is the proper standard of review, and accordingly that the court incorrectly relied on a rational basis analysis.

■ The Maine Constitution guarantees that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws." Art. I, § 6–A. Our equal protection guarantee is co-extensive with the guarantee in the United States Constitution, *Peters v. Saft*, 597 A.2d 50, 52 n. 1 (Me.1991), and we employ similar methods of analysis. If a challenged statute infringes a fundamental constitutional right or involves an inherently suspect classification such as race or religion, it is subject to analysis under the strict scrutiny standard. *Tri–State Rubbish v. New Gloucester*, 634 A.2d 1284, 1287 (Me.1993). That standard requires that the challenged action be narrowly tailored to achieve a compelling governmental interest. *Butler v. Supreme Judicial Court*, 611 A.2d 987, 992 (Me.1992). If a challenged statute involves neither a fundamental right nor a suspect class, different treatment accorded to similarly situated persons need only be rationally related to a legitimate state interest. *Aseptic Packaging Council v. State*, 637 A.2d 457, 459 (Me.1994); *Mahaney v. State*, 610 A.2d 738, 743 (Me.1992). When reviewed under a rational basis standard, a statute bears a strong presumption of validity. *Aseptic Packaging*, 637 A.2d at 460, and the party challenging the statute has the burden of proving that no conceivable state of facts exists to support the legislative action. *Id.* at 459–60.

■ We conclude that the Superior Court selected the appropriate standard of review, and correctly applied the rational basis analysis to the challenged parts of the Act. The issue before us does not involve an inherently suspect classification, and we need not address whether education is a fundamental right under the Maine Constitution because the plaintiffs' argument fails even if education is such a fundamental right. Plaintiffs presented no evidence at trial that any disparities in funding resulted in their students receiving an inadequate education. Rather, plaintiffs challenged under equal protection law the method by which funding reductions were implemented.

There is no provision in the Maine Constitution guaranteeing a certain level of state funding of education or equitable funding. To the contrary, the Maine Constitution requires only that the State enforce the municipal obligation to support public education.

> A general diffusion of the advantages of education being essential to the preservation of the rights and liberties of the people; to promote this important object, *the Legislature are authorized, and it shall be their duty to require, the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools.*

Me. Const. art. VIII, pt. 1, § 1 (emphasis added).

Even if we were to conclude that education is a fundamental right in Maine, plaintiffs offer no authority for the proposition that they have a fundamental right under the Maine Constitution to state funding, a particular mechanism for state funding, or a particular method for reducing state funding.[5]

---

5. We note that plaintiffs have not alleged nor proved such significant disparities in funding that a fundamental right to education, if it exists in the Maine Constitution, is implicated. *See San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 36–37, 93 S.Ct. 1278, 1298–99, 36 L.Ed.2d 16 (1973). While holding that education is not a fundamental right under the U.S. Constitution, the Court went on to note the following:

> Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short. Whatever merit appellees' argument might have if a State's financing system occasioned

■ We apply the rational basis test and affirm the court's finding that the funding reductions in the Act are rationally related to a legitimate governmental interest.[6] The Act departs from the foundation formula for the reductions in funding (compared to the levels recommended by the Commissioner) for fiscal years 1991 through 1994. The original Act did not address how such "funding reductions" would be accomplished. In each shortfall year, the Legislature amended the Act to establish the reduced funding level, and in most cases, specified how the reduction was to be accomplished. 20–A M.R.S.A. § 15602(4)–(8); 15603 (11–A), (26–A); 15610(1)(C), (E), (F); P.L. 1991, ch. 121, pt. A, § A–9. The Act as a whole, including the provisions for reductions from recommended levels of funding, continues to further a legitimate state goal of subsidizing the local communities' efforts to provide re-

sources for education, but to do so within available state revenues. Moreover, the Superior Court did not clearly err in failing to find that the funding reductions in the Act made Maine's system less equitable.[7]

Although, as we have stated on other occasions, "education is perhaps the most important function of state and local governments," *Blount v. Department of Educ. and Cultural Serv.*, 551 A.2d 1377, 1381 (Me.1988) (quoting *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954)), under our Constitution, the level of state support is largely a matter for the Legislature. Therefore, whether the funding reduction amendments to the School Finance Act are wise or not, and whether they are the best means to achieve the desired result, is a matter for the Legislature and not this Court.

an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where—as is true in the present case—no charge could fairly be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.

*See also Skeen v. State*, 505 N.W.2d 299, 315–16 (Minn.1993):

Because the state constitution does not require strict economic equality under the equal protection clause, it cannot be said that there is a "fundamental right" to any particular funding scheme, although, as we said above, there is a fundamental right to the basic level of funding needed to achieve a general and uniform education system. Where the state constitution merely requires that the funding of education "secure a thorough and efficient system"; the particular means employed to finance state education are left to the legislature's determination. Thus, we believe that challenges to the state's *financing* of education beyond what is necessary to provide an adequate level of education which meets all state standards must be evaluated, not under strict scrutiny, but rather under the rational basis test, and we will not set aside the legislature's determination unless the funding system employed somehow impinges upon the adequacy with which the state meets the fundamental right to a general and uniform education.

*See also Kukor v. Grover*, 148 Wis.2d 469, 436 N.W.2d 568, 580 (1989):

Therefore notwithstanding our recognition that *education* is, to a certain degree, a fundamental right, we apply, as did the United

States Supreme Court in *Rodriguez*, a rational basis standard because the rights at issue in the case before the court are premised upon spending disparities and not upon a complete denial of educational opportunity within the scope of art. X.

6. We reject plaintiffs' argument for an intermediate standard of review. Plaintiffs offer no convincing authority for their proposition. Even if the United States Supreme Court did apply an intermediate level of scrutiny in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), that case involved the denial of public school education to illegal immigrant children. In the instant case, the issue is the right to an equitable scheme for reducing funding, not the denial of an education.

7. We reject plaintiffs' argument that admission of Dr. John Augenblick's expert testimony on the equity of the Act was error because it violated M.R.Evid. 703. That rule reads:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence.

The statistical results relied on by Dr. Augenblick were admitted in evidence before his testimony. Therefore the limitation contained in the latter part of Rule 703 does not apply to this case. We also reject plaintiffs' argument that the court abused its discretion in excluding an exhibit.

The entry is:

Judgment affirmed.

All concurring.