JANE DOE[1] vs. SUPERINTENDENT OF SCHOOLS OF
WORCESTER & others.[2]

Worcester. March 7, 1995. - August 11, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Moot Question. Practice, Civil,* Moot case. *School and School Committee,* Enforcement of discipline. *Constitutional Law,* Education. *Due Process of Law,* Substantive rights, Vagueness of statute. *Words,* "Dangerous weapon."

In an appeal from a judgment in a civil action, affidavits documenting events occurring postjudgment were properly offered on the issue of the mootness of the appeal. [122-123]

Claims of a plaintiff on appeal arising from her one-year expulsion from public school were not rendered moot by her subsequent readmission to school after the disciplinary period, where she retained a substantial stake in the outcome of the proceedings. [123-124]

A public school principal had no discretion under G. L. c. 71, § 37H, to suspend rather than expel a student who had violated the school's weapons policy, where the principal was not of the opinion that the student would not pose a threat to the safety of the other students and staff at the school [124-126], and the school superintendent properly upheld the principal's decision where there was adequate evidence to support it [126].

The term "dangerous weapon" found in G. L. c. 71, § 37H, was not limited to the items listed in G. L. c. 269, § 10 (*b*), but rather, it appeared that the legislative intent was to leave the determination whether a particular object was a dangerous weapon within the meaning of the statute to the school principal responsible for enforcing the weapons policy in a public school. [126-128]

This court declined to construe *McDuffy* v. *Secretary of the Executive Office of Educ.,* 415 Mass. 545 (1993), to hold that a student's right to an education is a "fundamental right" under the State Constitution such as would trigger strict scrutiny analysis whenever school officials

---

[1]By her mother.

[2]Principal of the North High School and the school committee of Worcester.

determine, in the interest of safety, that a student's misconduct warrants expulsion. [128-132] LIACOS, C.J., dissenting.

A school principal's expulsion of a student, pursuant to his authority under G. L. c. 71, § 37H, for violation of the school's weapons policy did not violate the student's substantive due process rights under either the Massachusetts Constitution [132] or the Federal Constitution [133], where the expulsion was rationally related to school officials' interest in ensuring school safety. LIACOS, C.J., dissenting.

A public school principal's determination to expel a student for violation of the school's weapons policy without providing the student an alternative education program did not violate the student's substantive due process rights under the Massachusetts Constitution. [132-133]

General Laws c. 71, § 37H, which provides that "[a]ny student . . . found on school premises . . . in possession of a dangerous weapon, including, but not limited to, a gun or a knife . . . may be subject to expulsion . . .", is not unconstitutionally vague. [134]

CIVIL ACTION commenced in the Superior Court Department on April 29, 1994.

The case was heard by *Barbara A. Lenk*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*S. Stephen Rosenfeld* (*Jane Quimby* with him) for the plaintiff.

*Elizabeth M. Sanning*, Assistant City Solicitor (*David M. Moore*, City Solicitor, & *Diana H. Horan* with her) for the defendants.

The following submitted briefs for amici curiae:

*Scott Harshbarger*, Attorney General, & *Norah M. Wylie*, Assistant Attorney General, for the Commonwealth.

*Anthony J. DeMarco* & *Susan F. Cole* for Children's Law Center of Massachusetts & another.

*Eileen L. Ordover* for Center for Law and Education.

*Michael D. Weisman, Sara Miron Bloom* & *Alan Jay Rom* for Jami McDuffy & others.

O'CONNOR, J. The plaintiff, to whom we have given the pseudonym Jane Doe, appeals from a judgment, after a jury-waived trial, upholding her expulsion from school for at least one year, based on her possession of a lipstick case contain-

ing a one and one-quarter inch blade. We granted her application for direct appellate review.[3]

In a memorandum of decision, the judge in the Superior Court recited the following facts about which there appears to be no controversy. During the first week of the 1993-1994 school year, in response to the Education Reform Act (Act), St. 1993, c. 71, § 36, the school committee of Worcester (school committee) adopted a "Policy on Possession or Use of Weapons." That policy provided, in part, that:

> "In order to protect the students of the Worcester Public Schools, any student who is found on school premises or at school-sponsored or school-related events, including athletic games, in possession of a dangerous weapon, including, but not limited to, a gun or a knife may be subject to expulsion from the school by the principal regardless of the size of the knife. For purposes of this policy, a dangerous 'weapon' includes, but is not limited to, a gun, knife [or other specified items]."

During that week, staff at North High School (North High) distributed copies of the "School Policies, Rules and Services" for North High and "Policies and Programs Handbook in the Worcester Public Schools 1993-1994" (handbooks). Both handbooks contained the "Policy on Possession or Use of Weapons." Each student at North High received a copy of the handbooks and was required to sign a form acknowledging receipt. In addition to the handbooks, at all relevant times there were signs posted in North High which in-

---

[3]We gratefully acknowledge the briefs of the amici curiae: the Commonwealth; Center for Law and Education; Children's Law Center of Massachusetts, Inc., and Massachusetts Advocacy Center; plaintiffs in *McDuffy v. Secretary of the Executive Office of Educ.*, 415 Mass. 545 (1993). Because we affirm the judge's decision upholding the defendants' actions in this case, we need not reach the issues raised by the defendants' motions to strike portions of the amicus briefs submitted by the Center for Law and Education and the Children's Law Center of Massachusetts, Inc., and the Massachusetts Advocacy Center.

formed students that possession of a gun or a knife in school may result in expulsion.

The plaintiff moved to Worcester from Tennessee in November, 1992, and entered the ninth grade at North High. She was given a copy of the handbooks and she signed a form acknowledging that she had received them. She saw the posted signs reminding students of the weapons policy. She understood that a student who brought a knife into school might be expelled.

The plaintiff's parents experienced financial difficulties on their arrival. In the spring of 1993, school officials filed a "51A report" of suspected child abuse when the plaintiff's mother was seen hitting the plaintiff during a softball game. In April, 1993, the plaintiff ran away from home for five days. After moving to Worcester she tried to cut her wrists three times.

The plaintiff's school work was adversely affected by her personal and family problems. Although her grades were good during her first semester at North High, they deteriorated thereafter and she had twenty-three unexcused absences during the 1992-1993 school year. During the first two quarters of tenth grade, her grades were C's, D's, and F's. She was suspended from school several times for leaving school without permission, triggering a false fire alarm, smoking violations, tardiness, and cutting class. .

In October, 1993, the mother of the plaintiff's then boy friend gave her a regular-sized lipstick case which, when twisted open, revealed a pointed, single edge, one and one-quarter inch blade. The blade was sharply pointed but the cutting edge was dull.

On November 4, 1993, the plaintiff tried to cut her left wrist, her third suicide attempt since moving to Worcester. There is no suggestion that she used the lipstick knife to cut her wrist. She bandaged her wrist herself and did not tell her parents. The next morning, she noticed the lipstick knife in her drawer and took it to school to show her friends. During fifth period study hall, she showed the lipstick knife to other students and allowed two other students to hold it.

The study hall teacher asked the plaintiff about the bandage on her wrist. She claimed that she had hurt herself falling, but another student told the teacher that the plaintiff had tried to cut herself. Another student interjected that the plaintiff should show the teacher the lipstick knife. She eventually did so, after initially denying that she had it.

The assistant principal at North High, Elizabeth Drake, suspended the plaintiff for five days for having a knife in her possession. Drake also called in the plaintiff's parents and arranged for them to see a psychiatrist that afternoon. The record contains a letter from the psychiatrist stating that, at that time, the plaintiff was not a threat to herself or to others. Thereafter, the plaintiff saw a social worker several times.

Notice was sent to the plaintiff's family that there would be a principal's hearing on November 16, 1993. The notice informed the family that the plaintiff was alleged to have violated the weapons policy and could be expelled. The notice also stated that she had a right to be represented by an attorney and to present evidence and witnesses on her own behalf.

At the hearing, the plaintiff testified that she thought the lipstick knife was a joke. The plaintiff's social worker testified that the plaintiff needed to be in school and that, in her opinion, the plaintiff had not thought of the lipstick knife as a weapon.

The principal, Robert Boule, decided to expel the plaintiff, effective November 22, 1993, because, in his opinion, she was a threat to the safety of students and staff at the school. His decision was based on several factors, including the fact that the plaintiff had recently attempted suicide on three occasions. He considered the lipstick knife to be a knife. He believed that, although the plaintiff was remorseful, she had knowingly violated the weapons rule.

The plaintiff's parents were notified by letter that the principal had decided in favor of expulsion and that the plaintiff would be ineligible for readmission until November 22, 1994. They appealed from the principal's decision, and a second evidentiary hearing was held before the superintendent, Dr.

James L. Garvey. Superintendent Garvey upheld the expulsion. In making his decision, he considered the lipstick knife itself, the opinion of the plaintiff's social worker that the plaintiff was unstable, the plaintiff's disciplinary record, and her troubled family as factors favoring expulsion.

The city of Worcester does not provide alternative education for students who are expelled for weapons violations unless they are special education students, which the plaintiff was not. The plaintiff's mother, who is a substitute teacher, and a retired school teacher provided some tutoring to the plaintiff during her expulsion, but the family did not make significant efforts to pursue private alternative education options. According to an affidavit of the principal, the plaintiff was readmitted to school in November, 1994, into the tenth grade.

On appeal, the plaintiff argues that, in expelling her, the defendant school officials abused their discretion, acted outside their statutory authority, and violated her fundamental, constitutionally protected interest in a public education. She also argues that, if the court reads G. L. c. 71, § 37H, broadly enough to embrace the lipstick knife as a "dangerous weapon," then the statute is void for vagueness. The defendants contend that, because the plaintiff has now returned to school, the case is moot.

At the outset, we address the defendants' claim that this appeal should be dismissed because the issues involved are moot. The defendants argue that, because the plaintiff has been readmitted to school and is doing well, has been offered tutoring and counselling services by Worcester, and because her disciplinary record is required by law to be kept confidential, the remedies sought by the plaintiff in her complaint have been provided to her, and she no longer has any personal stake in the outcome of this case.

The plaintiff argues that the defendants' offer of tutoring and sessions with the school counsellor does not moot her claims. In addition, on February 13, 1995, the plaintiff filed a motion to strike from the record on appeal the contents of the addendum to the defendant's brief other than that part of

the affidavit of Principal Boule documenting the readmission of the plaintiff to the Worcester public schools. The defendants seek to establish by this addendum that the plaintiff has returned to school, is doing well, and has been offered tutoring and counselling services by Worcester. The plaintiff argues that because the information in the addendum concerns events which happened since the judge rendered her decision and thus could not be part of the record, those materials are not properly before this court on review. We deny the motion. Affidavits are the proper way to raise a question of mootness. *Hubrite Informal Frocks, Inc.* v. *Kramer*, 297 Mass. 530, 532-533 (1937), and cases cited. We do not agree with the plaintiff's argument that, because the judge did not consider evidence which was not in existence until six months after the trial ended, we should not consider that evidence even as to the issue whether this appeal is moot. Her argument would, in effect, preclude the raising of any claim of mootness at the appellate level.

We agree with the plaintiff's argument, however, that her claims are not moot. As the trial judge found, the plaintiff will need compensatory education to remedy her year out of school. No showing has been made that the services offered by the defendants will appropriately compensate her for the year she missed. In addition, although the defendants say that they will keep the plaintiff's school records confidential, she is subject to release of educational records, including disciplinary records, without her consent in certain circumstances. See 603 Code Mass. Regs. § 23.07(3) (1994); 20 U.S.C. § 1232g (b) (1) (1994); 34 C.F.R. § 99.31 (1993). The plaintiff, therefore, has a real and substantial stake in the outcome of her case. Moreover, the conduct complained of is "capable of repetition, yet evading review." This is because a student is usually readmitted to school following the enforcement of disciplinary rules before his or her case can be heard on appeal. See, e.g., *Honig* v. *Doe*, 484 U.S. 305, 317-323 (1988) (because an aggrieved student will often be finished with school or otherwise ineligible for protections under Federal law by the time review can be had in court,

the conduct complained of is "capable of repetition, yet evading review"). In light of the foregoing, we conclude that a decision on the merits will best serve the public interest.

We now turn to the plaintiff's arguments that, in expelling her, the defendants abused their discretion, acted ultra vires, and violated her fundamental right to a public education.

1. *Abuse of discretion.* The plaintiff contends that the defendant principal and the defendant superintendent abused their discretion in expelling her. We do not agree. The Education Reform Act, St. 1993, c. 71, § 36, rewrote G. L. c. 71, § 37H, to make it easier for school officials to expel students who possessed a weapon at school or school-related functions. Section 37H, as amended, provides in pertinent part:

> "The superintendent of every school district shall publish the district's policies pertaining to the conduct of teachers and students. . . .

> "Each school district's policies pertaining to the conduct of students shall include the following: disciplinary proceedings, including procedures for due process; standards and procedures for suspension and expulsion of students; . . . standards and procedures to assure school building security and safety of students and school personnel; and the disciplinary measures to be taken in cases involving the possession or use of illegal substances or weapons . . . .

> "In each school building containing the grades nine to twelve, inclusive, the principal, in consultation with the school council, shall prepare and distribute to each student a student handbook setting forth the rules pertaining to the conduct of students. . . .

> "Notwithstanding any general or special law to the contrary, all student handbooks shall contain the following provisions:

"(*a*) Any student who is found on school premises or at school-sponsored or school-related events, including athletic games, in possession of a dangerous weapon, including, but not limited to, a gun or a knife; or a controlled substance as defined in chapter ninety-four C, including, but not limited to, marijuana, cocaine, and heroin, may be subject to expulsion from the school or school district by the principal. . . .

"(*c*) Any student who is charged with violation of . . . paragraph (a) . . . shall be notified in writing of an opportunity for a hearing; provided, however, that the student may have representation, along with the opportunity to present evidence and witnesses at said hearing before the principal.

"*After said hearing, a principal may, in his discretion, decide to suspend rather than expel* a student who has been determined by the principal to have violated . . . paragraph (a) . . . *provided, however, that any principal who decides that said student should be suspended shall state in writing to the school committee his reasons for choosing the suspension instead of the expulsion as the most appropriate remedy. In this statement, the principal shall represent that, in his opinion, the continued presence of this student in the school will not pose a threat to the safety, security and welfare of the other students and staff in the school.*

"(*d*) Any student who has been expelled from a school district pursuant to these provisions shall have the right to appeal to the superintendent. The expelled student shall have ten days from the date of the expulsion in which to notify the superintendent of his appeal. The student has the right to counsel at a hearing before the superintendent. The subject matter of the appeal shall not be limited solely to a factual determination of whether the student has violated any provisions of this section." (Emphasis added).

Section 37H, therefore, permits a principal, in his discretion, to suspend rather than expel a student who is found to have violated the weapons policy. However, a principal is not permitted to exercise his discretion and decide on suspension rather than expulsion unless he or she is of the opinion that the student "will not pose a threat to the safety, security and welfare of the other students and staff in the school." In the instant case, based on the evidence presented at the principal's hearing, Principal Boule was not of the opinion that the plaintiff would not pose a threat to the safety of the other students and staff at the school. Under the statute, then, he was required to expel the plaintiff. He could not exercise his discretion and do otherwise. Accordingly, we conclude that Principal Boule did not exercise discretion. It follows that he did not abuse his discretion.

The plaintiff's argument that Superintendent Garvey abused his discretion also lacks merit. Section 37H grants broad discretionary authority to the principal, not to the superintendent. The superintendent is responsible for reviewing the principal's decision to determine whether the principal abused his discretion or was arbitrary or capricious. See, e.g., *Mayor of Revere* v. *Civil Serv. Comm'n,* 31 Mass. App. Ct. 315, 322 (1991). In the present case, the condition for Principal Boule's exercise of discretion was never met. Moreover, there was more than adequate evidence before Principal Boule to support his unwillingness to opine that the plaintiff was not a threat to others. Therefore, Superintendent Garvey properly upheld the principal's decision in this case.

2. *Ultra vires.* General Laws c. 71, § 37H, requires high school principals to prepare and distribute to each student a handbook containing a provision that a student who is found on school premises "in possession of a dangerous weapon, including, but not limited to . . . a knife . . . may be subject to expulsion . . . by the principal." The term "dangerous weapon" is not defined in § 37H. The plaintiff argues that the term should be construed in accordance with existing statutory and common law in order to promote uniformity in the implementation of § 37H throughout the schools of the

Commonwealth. In particular, the plaintiff urges this court to interpret the term "dangerous weapon" to include only those items listed in G. L. c. 269, § 10 (*b*) (1992 ed.). That statute makes it a crime to carry on one's person or under one's control in a motor vehicle any one of a number of items, including,

> "any stiletto, dagger, or a device or case which enables a knife with a locking blade to be drawn at a locked position, any ballistic knife, or any knife with a detachable blade capable of being propelled by any mechanism, dirk knife, any knife having a double-edged blade, or a switch knife, or any knife having an automatic spring release device by which the blade is released from the handle, having a blade of over one and one-half inches."

The judge rejected the interpretation of § 37H which the plaintiff urges, stating as follows:

> "There is no sound basis, absent a specific legislative mandate, to import into a school setting a standard required by the criminal law. . . . Schools are charged with the daunting task of educating children from diverse backgrounds, with diverse abilities, needs and problems. . . . If effective education is to be possible, school authorities must provide and maintain a safe learning environment. Educators of necessity have broad authority to maintain order, discipline and safety; the exercise of such authority must be left to their sound discretion since so many variables are inherently involved. . . . There is no reason to believe that the Legislature wished to limit the types of knives which a student was forbidden to bring to school. Indeed, there is no reason to believe that the Legislature wanted school authorities to forbear with respect to those knives not included within the criminal statute until such time as those knives are actually used by students and increase the risk to others in the school community. . . ."

We agree with the judge that, in light of the broad disciplinary authority historically conferred on school officials, it appears that the Legislature intended to leave the determination whether a particular object is a dangerous weapon to the sound judgment of the principal. Section 37H does not explicitly limit the types of knives which could be considered dangerous weapons. Instead, the Legislature used an all inclusive phrase, "including but not limited to a gun or a knife." If the Legislature had intended the term "dangerous weapon" to include only those items set forth in G. L. c. 269, § 10 (*b*), it could easily have done so expressly, which it did not. As the judge pointed out, "[t]his omission can only be viewed as intentional since, in the very same sentence [of § 37H], the Legislature specifically defined prohibited illegal substances as 'controlled substance[s] as defined in chapter ninety-four C.' G. L. c. 71, § 37H." If the Legislature intentionally omits language from a statute, no court can supply it. *Boylston Water Dist.* v. *Tahanto Regional Sch. Dist.*, 353 Mass. 81, 84 (1967), quoting *Mitchell* v. *Mitchell*, 312 Mass. 154, 161 (1942).

In the present case, the item in question, a lipstick case which, when opened, revealed a one and one-quarter inch blade, had no apparent purpose except to inflict harm. The plaintiff does not suggest otherwise. We conclude, as did the trial judge, that Principal Boule was justified in determining that the lipstick knife was a dangerous weapon under the school weapons policy. Accordingly, the plaintiff's expulsion was authorized by § 37H.

3. *Constitutional right to an education under the State Constitution.* Part II, c. 5, § 2, of the Massachusetts Constitution provides that "it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish . . . public schools and grammar schools in the towns." In *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 621 (1993), the court interpreted this clause to "impose an enforceable duty on the magistrates and Legislatures of this Commonwealth to provide education in the public schools for the children there enrolled, whether

they be rich or poor and without regard to the fiscal capacity of the community or district in which such children live." The question before the court in *McDuffy*, *supra*, was whether the Massachusetts school-financing system was constitutional, and the court held that it was not.

The plaintiff asserts that *McDuffy* should be construed as holding that she, as an individual, has a "fundamental right" to a public education under Part II, c. 5, § 2. From this assertion, she argues that her expulsion violated her right to substantive due process under the Massachusetts Constitution because expulsion was not the appropriate discipline. It was, she claims, not the least restrictive alternative since either suspension or the provision of alternate education was feasible. The judge refused to read *McDuffy* in the manner advocated by the plaintiff, stating:

> "[The plaintiff] does not have a fundamental right to an education in the sense asserted. The right which [she] does have is that of an equal opportunity to an adequate education, a right which she may lose by conduct seen to be detrimental to the community as a whole. The Legislature has made plain that school officials may exclude students such as [the plaintiff] who violate school rules which proscribe weapons possession in school. It is not difficult to see how such rules further the welfare of the school community."

We agree that *McDuffy* should not be construed as holding that the Massachusetts Constitution guarantees each individual student the fundamental right to an education. While the court acknowledged in *McDuffy* the importance of education and decided that the Commonwealth generally has an obligation to educate its children, the court did not hold, and we decline to hold today, that a student's right to an education is a "fundamental right" which would trigger strict scrutiny analysis whenever school officials determine, in the interest of

safety, that a student's misconduct warrants expulsion.[4] In fact, the court implicitly recognized in *McDuffy* that educational opportunities can be lost by students as a result of

---

[4]With the exception of *State* v. *Rivinius*, 328 N.W.2d 220, 228 (N.D. 1982), cert. denied, 460 U.S. 1070 (1983), which involved a violation of the State's compulsory school attendance law by parents who sent their children to a Christian day school not approved by the county or the State, all the cases from other jurisdictions which the dissent cites as declaring "that education is a fundamental or paramount right or interest," *post* at 140, are, like *McDuffy*, school-financing cases. The only case we have found that stands for the proposition that education is "fundamental" in the same sense that the constitutional guarantees of freedom of religion and freedom of speech and the press are considered fundamental, is *State* v. *Rivinius*, *supra*. We decline to follow the reasoning of that case. Instead, we join the courts of several other jurisdictions in holding that education is not a fundamental right. See *Lujan* v. *Colorado State Bd. of Educ.*, 649 P.2d 1005, 1018 (Colo. 1982) ("A heartfelt recognition and endorsement of the importance of an education does not elevate a public education to a fundamental interest warranting strict scrutiny"); *McDaniel* v. *Thomas*, 248 Ga. 632, 647 (1981) ("Consistent with the holding of the U.S. Supreme Court in Rodriguez, as well as the decisions of the highest courts in a number of sister states, we hold that education per se is not a 'fundamental right' "); *Idaho Schs. for Equal Educ.* v. *Evans*, 123 Idaho 573, 582 (1993) (holding that education is not a fundamental right, and, therefore, strict scrutiny standard did not apply); *Board of Educ., Levittown* v. *Nyquist*, 57 N.Y.2d 27, 43 (1982), appeal dismissed, 459 U.S. 1138 (1983) (circumstance that public education is unquestionably high on list of priorities of governmental concern and responsibility does not automatically entitle public education to classification as fundamental constitutional right triggering higher standard of judicial review for purposes of equal protection analysis); *Kirby* v. *Edgewood Indep. Sch. Dist.*, 761 S.W.2d 859, 863-864 (Tex. Ct. App. 1988), rev'd on other grounds, 777 S.W.2d 391 (Tex. 1989) ("This court concludes that education, although vital, does not rise to the same level as the right to engage in freedom of speech or to exercise religion free of governmental interference, both rights which have long been recognized as fundamental and entitled to protection under both the federal and state constitutions. . . . [T]he district court erred in concluding that education is a 'fundamental' right"). See also *School Admin. Dist. No. 1* v. *Commissioner, Dep't of Educ.*, 659 A.2d 854 (Me. 1995); *Board of Educ. of City Sch. Dist. of Cincinnati* v. *Walter*, 58 Ohio St. 2d 368, 376 (1979), cert. denied, 444 U.S. 1015 (1980); *Fair Sch. Fin. Council of Okla.* v. *State*, 746 P.2d 1135, 1150 (Okla. 1987), in each of which the court has refused to apply the strict scrutiny standard, but has applied rational basis review instead, indicating an unwritten conclusion that these courts do not consider education to be "fundamental" in the same way that First Amendment guarantees are deemed fundamental.

their actions. There, the court quoted portions of earlier decisions which affirmed the authority of the Legislature and school officials to exclude students who misbehave:

> "In a series of cases, this court has held that various actions of the Legislature accorded with the 'duty' imposed on it by Part II, c. 5, § 2, and has characterized the duty as the 'public obligation to provide for general education.' *Nicholls* v. *Mayor & School Comm. of Lynn*, 297 Mass. 65, 68 (1937). There we stated: 'In the performance of the obligation thus imposed on the Commonwealth' by Part II, c. 5, § 2, it was 'within the competency of the General Court' to enact a statute 're-quiring the flag salute and the pledge of allegiance' in the public schools. . . . In *Antell* v. *Stokes*, 287 Mass. 103, 105-06 (1934), we declared: 'Education of youth was provided at public expense and with anxious solici-tude through the colonial and provincial periods of our history. The duty to maintain and cherish public schools was declared in the Constitution, c. 5, § 2.' Further, we noted that the General Court had taken 'jealous care' to clothe 'municipal officers with adequate authority to en-courage the highest practicable efficiency of the system of public education . . . and, that, therefore, the Haver-hill school committee was fully empowered to issue and enforce a rule forbidding public high school students from participating in secret societies." *McDuffy*, *supra* at 602.

*McDuffy*, therefore, suggests that the Legislature's and school officials' duty to provide children an adequate public education includes the duty to provide a safe and secure envi-ronment in which all children can learn. Our prior decisions support the view that a student's interest in a public educa-tion can be forfeited by violating school rules. See *Nicholas B.* v. *School Comm. of Worcester*, 412 Mass. 20, 21-23 (1992) (school committee did not exceed disciplinary author-ity by expelling student who assaulted a fellow student off

school grounds and there was no requirement of showing compelling interest); *Leonard* v. *School Comm. of Attleboro,* 349 Mass. 704, 708-709 (1965) (school has right to expel student provided school committee's actions supported by rational basis); *Sherman* v. *Charlestown,* 8 Cush. 160, 163-164 (1851) (enjoyment of benefit of education is common right and not an exclusive personal one; therefore, school committee has power, in order to maintain discipline, to exclude from school pupil for good and sufficient cause).

In light of our conclusion that the plaintiff does not have a fundamental right to an education under Part II, c. 5, § 2, we apply the lowest level of scrutiny, the rational basis test, to her claim that the defendants' actions pursuant to § 37H violated her right to substantive due process under the State Constitution. See, e.g., *Marshfield Family Skateland, Inc.* v. *Marshfield,* 389 Mass. 436, 445-446, appeal dismissed, 464 U.S. 987 (1983) (governmental action which intrudes on interests deemed nonfundamental by court must simply be rationally related to a legitimate State objective to pass constitutional muster).

The plaintiff first contends that, on the facts of her case, suspension rather than expulsion was the appropriate penalty. Applying the rational basis test, we conclude, as did the trial judge, that her expulsion did not violate her right to substantive due process under the State Constitution, since "[i]t [was] reasonable and rational for school officials to determine that [the plaintiff] should be expelled as a means of insuring school safety."

The plaintiff's next argument is that, even assuming that expulsion had been warranted by the facts, the defendant school officials' choice to expel her without providing her an alternate educational program violated her substantive due process rights under the Massachusetts Constitution. We do not agree. Under the minimal scrutiny of the rational basis test, the fact that a less onerous alternative exists is irrelevant. Thus, since her expulsion was rationally related to the maintenance of order in the school, the defendants' decision

not to provide the plaintiff with an alternate education does not render her expulsion unconstitutional.

This is consistent with our holding in *Board of Educ.* v. *School Comm. of Quincy,* 415 Mass. 240, 244-246 (1993), that there is no requirement under Massachusetts law that a school system provide an educational alternative to a student who properly has been expelled for disciplinary reasons. It reasonably may be argued that a requirement that a student who is expelled for misconduct, no matter how egregious, be provided with alternate education by a public school system, would be likely to have a serious detrimental effect on the ability of school officials to deter dangerous behavior within a school by imposing expulsion as a sanction. In any event, we think that it is for the Legislature, not the courts, to decide when, if ever, alternative education must be provided to students expelled for disciplinary reasons, and the form such education must take.

4. *Substantive due process under the United States Constitution.* The plaintiff argues that her expulsion violated her substantive due process rights under the Fourteenth Amendment to the United States Constitution. We do not agree. A person does not have a fundamental right to an education under the Federal Constitution. Thus, the appropriate level of scrutiny is the rational basis test. *San Antonio Indep. Sch. Dist.* v. *Rodriguez,* 411 U.S. 1, 38-40 (1973) (rational basis test to be applied to State action which infringes on person's right to obtain education). So long as the official action is directed to a legitimate or substantial purpose and is rationally related to achieving that purpose, it is not unconstitutional. *Plyler* v. *Doe,* 457 U.S. 202, 224 (1982), *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U.S. 483, 491 (1955). Applying the rational basis test to the facts of this case, we conclude that the plaintiff's expulsion was rationally related to the school officials' interest in protecting other students and staff from potential violence. Accordingly, her expulsion did not violate her substantive due process rights under the United States Constitution.

5. *Void for vagueness.* Finally, the plaintiff argues that if the lipstick knife which she possessed is a dangerous weapon under G. L. c. 71, § 37H, the statute is void for vagueness and its application to her violates her due process rights as guaranteed by art. 10 of the Massachusetts Declaration of Rights and the Fourteenth Amendment. We disagree.

A law is void for vagueness if persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Caswell* v. *Licensing Comm'n for Brockton,* 387 Mass. 864, 873 (1983), quoting *Smith* v. *Goguen,* 411 U.S. 566, 572 n.8 (1974). A statute must define an offense only with sufficient definiteness so that ordinary people can understand what conduct is prohibited and so that it does not encourage arbitrary and discriminatory enforcement. *Commonwealth* v. *Taylor,* 413 Mass. 243, 248 (1992). General Laws c. 71, § 37H, states that "[a]ny student who is found on school premises . . . in possession of a dangerous weapon, including, but not limited to, a gun or a knife . . . may be subject to expulsion . . . ." The statute clearly prohibits the bringing of knives onto school grounds. The type of knives included as dangerous weapons in § 37H is all inclusive. As the trial court noted, "The term 'knife' is generic and commonly used and understood."

In the instant case, the plaintiff brought a knife to school, an act which was clearly prohibited. When the plaintiff told the study hall teacher that she did not have the knife, her fellow classmates explained to the teacher that the knife was inside the lipstick case. The language of § 37H was definite enough to alert all the other students as to which conduct was forbidden. We conclude that § 37H is not unconstitutionally vague. See *Wood* v. *Strickland,* 420 U.S. 308, 324-325 (1975), overruled on other grounds, *Harlow* v. *Fitzgerald,* 457 U.S. 800 (1982) (school officials need not use statutory definition of intoxicating liquor in interpreting school rule prohibiting possession of intoxicating beverages).

6. *Conclusion.* In summary, we conclude that this case is not moot because the plaintiff has a substantial stake in the outcome, and because the conduct complained of is "capable

of repetition, yet evading review." We reject the plaintiff's arguments that the defendants abused their discretion, acted outside their statutory authority, and violated the plaintiff's State and Federal constitutional rights to an education. Finally, we conclude that G. L. c. 71, § 37H, is not unconstitutionally vague.

*Judgment affirmed.*

LIACOS, C.J. (dissenting). While I agree with most of the court's analysis of the various issues in this appeal, I cannot agree that a child's right to an education, based on Part II, c. 5, § 2, of the Massachusetts Constitution is not a fundamental right. Thus, I cannot agree that the standard of review to be applied to the defendants' actions need only have a rational basis to be deemed constitutionally valid. I write separately to set forth my views on these two related issues.

In *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545 (1993), we conducted an exhaustive review of the history, structure, and meaning of Part II, c. 5, § 2.[1] We concluded: "What emerges from this review is that the words are not merely aspirational or hortatory, but obligatory. What emerges also is that the Commonwealth has a duty to provide an education for *all* its children, rich and poor, in

[1]Part II, c. 5, § 2, of the Massachusetts Constitution provides: "Wisdom and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge, public schools and grammar schools in the towns; to encourage private societies and public institutions, rewards and immunities, for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and a natural history of this country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and frugality, honesty and punctuality in their dealings; sincerity, good humour, and all social affections, and generous sentiments among the people."

every city and town of the Commonwealth at the public school level, and that this duty is designed not only to serve the interests of the children, but, more fundamentally, to prepare them to participate as free citizens of a free State to meet the needs and interests of a republican government, namely the Commonwealth of Massachusetts" (emphasis in original).[2] *Id.* at 606.

I cannot agree with the court's characterization of the question before the court in *McDuffy* as being merely "whether the . . . school-financing system was constitutional." *Ante* at 129. Indeed, we acknowledged that the *McDuffy* plaintiffs were correct in claiming that the school-financing system denied them the opportunity to receive the education which the Constitution guaranteed them. Further, we held that the denial violated their constitutional rights. *Id.* at 617. It is true that in light of the arguments put before us, we restricted ourselves to a determination whether Part II, c. 5, § 2, is hortatory or imposes a constitutional duty. *Id.* at 550-551. We concluded that an enforceable duty exists. *Id.* at 551, 621. We stated: "It is clear that c. 5, § 2, obligates the Commonwealth to educate *all* its children" (emphasis in original). *Id.* at 617. Thus, I think it wrong to deny that *McDuffy* indicated "that the Massachusetts Constitution guarantees each . . . student the fundamental right to an education." *Ante* at 129. That issue was not explicitly decided, but the implication to the contrary is clear.

Our task today is not to reinterpret *McDuffy*, but to recognize its content.

1. *Education.* The duty of Legislatures and magistrates to cherish public schools and grammar schools is solemn testimony "to their importance in maintaining a system of popular government, which shall secure not only peace and order, but individual freedom and elevation of character." *Jenkins* v. *Andover*, 103 Mass. 94, 97 (1869).[3]

---

[2] With this conclusion, the author of the court's opinion agreed. *Id.* at 621 (O'Connor, J., concurring in part and dissenting in part).

[3] The relationship between the provision of elementary education for all citizens in early Athens, at least a century before Socrates, and the rise of

The universality of this primacy of education for both our democratic society and our citizens was expressed by the Supreme Court in *Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483, 493 (1954):

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."[4]

2. *A right.* I turn now to a brief examination of the rationale for the *McDuffy* decision, because it will serve as a foundation for consideration whether the trial judge erred in deciding that the plaintiff does not have a fundamental right to an education which she could enforce against the defendants. Clearly, since *McDuffy*, the Commonwealth has a duty to provide education to the plaintiff and it is an enforceable one.

democracy, is mentioned by Isador Stone in The Trial of Socrates 42 (1988).

[4] Nevertheless, there is no Federal constitutional right to education comparable to that provided by the Massachusetts Constitution. See *Plyler* v. *Doe*, 457 U.S. 202, 221 (1982) ("Public education is not a 'right' granted to individuals by the Constitution"). From another perspective, "[p]roviding public schools ranks at the very apex of the function of a State." *Wisconsin* v. *Yoder*, 406 U.S. 205, 213 (1972). Federal case law is of little relevance in analyzing the enforceable right to education provided by Part II, c. 5, § 2, of the Massachusetts Constitution.

*McDuffy* v. *Secretary of the Executive Office of Educ.,*
*supra* at 606-607.[5] This duty exists to serve her interests, as
well as those of the Commonwealth. *Id.* at 606. As a matter
of logic and of law, she has a correlative right to education.

The Commonwealth's duty is enforceable by the plaintiff,
among others. The plaintiffs in *McDuffy* were public school
students who sought a declaration of rights under G. L.
c. 231A (1994 ed.). *Id.* at 548. Proceedings under that chap-
ter have both "actual controversy" and "standing" require-
ments; are concerned with the resolution of real controver-
sies; and the resulting declaration "is intended to have an
immediate impact on the rights of the parties." *Massachu-*
*setts Ass'n of Indep. Ins. Agents & Brokers, Inc.* v. *Commis-*
*sioner of Ins.,* 373 Mass. 290, 292 (1977), and cases cited.
Would the plaintiff, a public school student, be eligible to
seek enforcement of the Commonwealth's duty to provide ed-
ucation, yet not have a right to that education?

I reinforce the idea that there is a correlative right to the
(*McDuffy*) constitutional duty, by reference to a recent opin-
ion in which the Supreme Court of New Hampshire held
that its Constitution "imposes a duty on the State to provide
a constitutionally adequate education to every educable child
. . . and to guarantee adequate funding." *Claremont Sch.*
*Dist.* v. *Governor,* 138 N.H. 183, 184 (1993). The New
Hampshire Supreme Court observed that New Hampshire
shares its early history with Massachusetts; that the State
modeled much of its Constitution on ours; and that the provi-
sions regarding education are nearly identical. *Id.* at 186. Of
particular significance here is that court's statement: "Hav-
ing identified that a duty exists and having suggested the na-
ture of that duty, *we emphasize the corresponding right of*
*the citizens to its enforcement*" (emphasis added). *Id.* at
191-192. The court then added that "a free public education
is at the very least an important, substantive right"; that it is
"not based on the exclusive needs of a particular individual,

---

[5]Thus, reliance on earlier Massachusetts cases in an effort to dilute the
*McDuffy* holding is inappropriate.

but rather is a right held by the public"; and, that "[a]ny citizen has standing to enforce this right." *Id.* at 192.

Moreover, the Supreme Court of Washington, in deciding that the section of that State's Constitution which declares it to be the State's "paramount duty" to provide for the education of all children was mandatory and imposed a judicially enforceable, affirmative duty, stated that the children possessed a right (of equal stature) flowing from that duty. *Seattle Sch. Dist. No. 1 v. State,* 90 Wash. 2d 476, 510-513, 523 (1978). The *McDuffy* court not only referred to this duty-right relationship, but also noted "that a *constitutional right to an education* is fully consistent with the provisions of several articles in the Declaration of Rights" (emphasis added). *McDuffy* v. *Secretary of the Executive Office of Educ., supra* at 566 n.23. Today, I add that the constitutional right to education is of no less a magnitude in our jurisprudence than an insurer's "fundamental right to a decision as to its liability." *Furlong* v. *Cronan,* 305 Mass. 464, 468 (1940). Furthermore, recognition of such a right as being generated by Part II, c. 5, § 2, is at least as soundly based as references to an inmate's "constitutional right" to judicial review of the sufficiency of the evidence to warrant the findings of a prison disciplinary board (*Hill* v. *Superintendent, Mass. Correctional Inst., Walpole,* 392 Mass. 198, 200-203 [1984], rev'd on other grounds, 472 U.S. 445 [1985]); a plaintiff's "fundamental right" to work with his hands to what he regards as his best advantage (*Saveall* v. *Demers,* 322 Mass. 70, 75 [1947]); the public's "fundamental right" to read (*Commonwealth* v. *Isenstadt,* 318 Mass. 543, 551 [1945]); and an individual's "fundamental right" to own property (*Lynnfield* v. *Owners Unknown,* 397 Mass. 470, 474 [1986]).

In addition, Black's Law Dictionary 505 (6th ed. 1990) indicates in its treatment of "duty," "In its use in jurisprudence, this word is the correlative of right. Thus, wherever there exists a right in any person, there also rests a corresponding duty upon some other person or upon all persons generally."

3. *A fundamental right.* I also believe that this constitutional duty generates a right which, for purposes of legal analysis, is fundamental. I do not base this conclusion simply on the obviously inadequate notion expressed in *San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S. 1, 33-34 (1973), that "the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution." Here we have unique factors, and need not consider an all-purpose test.

I first look to the nature of the right and its interrelated affirmative and enforceable duty, the separate and prominent treatment of education in our Constitution, the importance of education in Massachusetts since the earliest years of the colony, our related statutes including those on compulsory attendance, the relationship of education to other rights of our citizens, and the "keystone" role education serves in the development of each individual and in the functioning of our democracy.

Furthermore, a determination, based on a provision or provisions of a State's Constitution, that education is a fundamental or paramount right or interest is not unusual and has been based on language less explicit than that in our Constitution. See, e.g., *Roosevelt Elementary Sch. Dist.* v. *Bishop*, 179 Ariz. 233, 238 (1994), citing *Shofstall* v. *Hollins*, 110 Ariz. 88, 89-90 (1973) (fundamental right based on provisions requiring "the establishment and maintenance of a general and uniform public school system" and "a system of common schools"); *Serrano* v. *Priest*, 18 Cal. 3d 728, 761, 765-769 (1976), cert. denied sub nom. *Clawes* v. *Serrano*, 432 U.S. 907 (1977) (same; based on provisions guaranteeing equal protection); *Horton* v. *Meskill*, 172 Conn. 615, 691 n.2, 645-649 (1977) (same; based, apparently, on both education ["always shall be free public . . . schools [and the] general assembly shall implement this principle"] and equal protection provisions); *Rose* v. *Council for Better Educ., Inc.*, 790 S.W.2d 186, 205-206 (Ky. 1989) (same; based at least on § 183 of the Kentucky Constitution: "The General Assembly shall, by appropriate legislation, provide

for an efficient system of common schools throughout the State"); *Skeen* v. *State*, 505 N.W.2d 299, 302, 313 (Minn. 1993) (same; based on art. 13, § 1, of the Minnesota Constitution: "Uniform system of public schools. The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions . . . as will secure a thorough and efficient system . . ."); *Bismarck Pub. Sch. Dist. 1* v. *State*, 511 N.W. 2d 247, 250, 256 (N.D. 1994), citing *State* v. *Rivinius*, 328 N.W.2d 220, 228 (N.D. 1982), cert. denied, 460 U.S. 1070 (1983) ("constitutional provisions relating to education have at least equal standing with" provisions "guaranteeing freedom of religion and freedom of speech and press"); *Scott* v. *Commonwealth*, 247 Va. 379, 384-386 (1994) (same; based at least upon art. 8 of the Virginia Constitution providing, in part: "The General Assembly shall provide for a system of . . . schools . . . and shall seek to ensure that an educational program of high quality is established and . . . maintained"); *Seattle Sch. Dist. No. 1* v. *State, supra* at 510-513, 523 (same; based on art. 9, § 1, of the Washington Constitution, providing in part: "It is the paramount duty of the state to make ample provision for the education of all children . . ."); *Pauley* v. *Kelly*, 162 W. Va. 672, 707 (1979) (same; based on "the mandatory requirement of 'a thorough and efficient system of free schools,' . . . in Article XII, Section 1 of our Constitution"); *Kukor* v. *Grover*, 148 Wis. 2d 469, 496, 498 (1989) ("we do agree with appellants that 'equal opportunity for education' is a fundamental right"; "our recognition that education is, to a certain degree, a fundamental right"); *Washakie County Sch. Dist. No. 1* v. *Herschler*, 606 P.2d 310, 315, 333 (Wyo. 1980), cert. denied sub nom. *Hot Springs County Sch. Dist. No. 1* v. *Washakie County Sch. Dist. No. 1,* 449 U.S. 824 (1980) (same; based on violation of equal protection requirements of State Constitution).

Courts in at least two other jurisdictions have determined that there is a right to education, but they have not needed

to reach the question whether it is a fundamental right. *Dupree* v. *Alma Sch. Dist. No. 30*, 279 Ark. 340, 342-343, 345-346 (1983) (based on equal protection provision and provision for State maintaining a general, suitable, and efficient system of education); *Tennessee Small Sch. Sys.* v. *McWherter*, 851 S.W.2d 139, 150-151 (Tenn. 1993) (requirement of art. 11, § 12, of Tennessee Constitution that the General Assembly shall "provide for the maintenance [and] support . . . of a system of free public schools").

For us to retreat from the principles stated in *McDuffy* would be to deny the thrust and logic of its historical underpinnings and would be inconsistent with the letter of our Constitution. Such a retreat would ignore the opinions of other State courts and put Massachusetts into the sad condition of giving greater status to property rights and other rights, recognized as fundamental, which are not as fundamental to the liberty of our free citizens and the preservation of our constitutional democracy as is the right to a public education. This right is necessary "fundamentally, to prepare [our children] to participate as free citizens of a free State to meet the needs and interests of a republican government, namely the Commonwealth of Massachusetts." *McDuffy*, *supra* at 606. In such a retreat I cannot join.

4. *Standard of review.* Having determined that the plaintiff has a fundamental right to education, I turn to the question whether her expulsion pursuant to G. L. c. 71, § 37H, violated substantive due process principles of the Constitution of the Commonwealth.[6] Part II, c. 1, § 1, art. 4, and arts. 1, 10 and 12 of the Declaration of Rights are the provisions of our Constitution comparable to the due process clause of the Federal Constitution. *Pinnick* v. *Cleary*, 360 Mass. 1, 14 n.8 (1971). We have described the relevant Federal test as requiring strict scrutiny if the interest asserted by the plaintiff is fundamental and the infringement is substan-

---

[6] I note at the outset that the plaintiff properly concedes that, even if the right is fundamental, discipline, including expulsion, may be reasonably necessary to maintain safety and security in the schools.

tial. *Langone* v. *Secretary of the Commonwealth*, 388 Mass. 185, 196, appeal dismissed sub nom. *Bellotti* v. *Connolly*, 460 U.S. 1057 (1983). If so, we would consider whether the matter serves a compelling State interest with as little infringement as possible. *Id. Opinion of the Justices*, 385 Mass. 1201, 1206 (1982).

"We have at times expressed the relevant [Massachusetts] test in similar language." *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629, 655 (1981). *Commonwealth* v. *O'Neal*, 369 Mass. 242, 245 (1975) (Tauro, C.J., concurring). We have also observed that the terms rational basis and strict scrutiny "are a shorthand for referring to the opposite ends of a continuum of constitutional vulnerability determined at every point by the competing values involved." *Marcoux* v. *Attorney Gen.*, 375 Mass. 63, 65 n.4 (1978).

In applying the standard, I reiterate that the plaintiff has a fundamental right to education, and note that it has been infringed substantially by her expulsion. In addition to agreeing that school discipline, including expulsion, may be warranted when necessary to maintain safety and security in the schools (see note 6, *supra*), the plaintiff also agrees in her brief that preserving the safety, security, and welfare of school staff and students is a compelling State interest. Such a conclusion seems to me to be inescapable. A child may be entitled to an education but is not entitled to disrupt or to endanger the educational process. Thus, the remaining inquiry is that of determining whether that compelling State interest is served with as little infringement as possible.

I turn briefly to an examination of the "interests" at stake. See *Moe* v. *Secretary of Admin. & Fin.*, *supra* at 655-659; *Commonwealth* v. *O'Neal*, *supra* at 251-273. I do not consider the right to education to be without interrelated responsibilities, including complying with norms of behavior and standards of conduct of which the plaintiff was aware and to which she had subscribed. The right to education must be put in context. To do so one need not enunciate that a lower standard of review applies to a student. See *Vernonia Sch. Dist. 47J* v. *Acton*, 115 S. Ct. 2386, 2392 (1995) (school's

power over school children permits a degree of supervision and control that could not be exercised over free adults, Fourth Amendment rights are different in public schools), *Commonwealth* v. *Carey*, 407 Mass. 528, 533 (1990) (citing United States Supreme Court's reduced constitutional standard to validate student searches); *Selectmen of Framingham* v. *Civil Serv. Comm'n*, 366 Mass. 547, 556 (1974) (courts freer in finding a governmental interest has overcome students' right).

In at least one instance this court, after concluding that the State's interest in protecting the welfare of children met the compelling State interest standard, declined to apply the least restrictive alternative test. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 264-265 (1978). We stated: "Our focus of inquiry necessarily changes . . . where . . . the State acts not simply as an arm of the majority, but on behalf of a helpless individual within its midst." *Id.* at 265. Here, as in that instance, "the balance to be struck is more complex in nature . . . and involves a task to which the doctrine of least restrictive alternatives should not be uncritically applied." *Id.* at 266. A statement the court made in a proceeding based on a petition to dispense with a mother's consent to a subsequent adoption of her child provides appropriate guidance: "Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 632, 646 (1975).

In other contexts, the court looked to various factors as the preservation of life, the protection of innocent persons, the prevention of suicide, and the maintenance of orderly administration. *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 741 (1977). *Commissioner of Correction* v. *Myers*, 379 Mass. 255, 266 (1979). In applying these analytical factors here, especially the protection of students and staff, and the prevention of suicide (given the plaintiff's unfortunate history), it is possible to conclude that

because the school has a measure of custody over each student, statutory expulsion is the least restrictive alternative. Transfer to another school, tutoring, or daily searches would not necessarily have eliminated safety concerns. We do not know if home education would have been practical. A short suspension might not have served the compelling State interest. In addition, it is conceivable that a student could use possession of an item such as that at issue to manipulate the administration into providing an alternative educational setting. Deterrence could be impaired. In this context, expulsion could be adequately justified as the least restrictive alternative. See *Commonwealth* v. *Leis*, 355 Mass. 189, 196 (1969) (ample justification for the Legislature to conclude that the total prohibition of marihuana is the "least restrictive alternative").

The burden is on the State to demonstrate its objectives could not be achieved in a less restrictive manner than by expulsion. I do not read the conclusory assertion in the brief of the school officials as satisfying that burden. The plaintiff, as noted above, does not dispute the compelling interest in safety. The question is whether that objective could have been achieved in a less restrictive manner. The officials have not shown, for example, that a statutory or administrative procedure could not be established which would protect the safety of staff and students while permitting the education of the plaintiff to continue in some setting. Nor have the officials met their burden to set out factors to be weighed in applying the standard of review. See *Cepulonis* v. *Secretary of the Commonwealth*, 389 Mass. 930, 935-937 (1983). I agree with the plaintiff that there is an incongruity in treating education as a fundamental right without requiring a more particularized showing by the defendants.

The judge did not have the benefit of the explicit statement here that the plaintiff has a constitutional, fundamental right to education. Thus, I would enter a judgment declaring that right and remand the matter to the Superior Court for such proceedings as may be appropriate, including, if necessary, consideration whether the compelling State interest was

served with as little infringement as possible. At that time the plaintiff may request consideration of the elements of relief listed in her brief.[7]

I dissent.

---

[7]The judge, on reconsideration, would be free to conclude that compensatory measures taken by the defendants since the plaintiff's reinstatement were adequate and that no further relief is necessary.