WILLIAM JENKINS & others. *vs.* INHABITANTS OF ANDOVER & others.

A town has no authority independently of statute law; nor, under the eighteenth article of amendment of the Constitution of the Commonwealth, can take authority by statute; to raise by taxation and appropriate money to support a school, as a public school, which is founded by a charitable bequest that vests the order and superintendence of it in trustees, who, though a majority of them are to be chosen by the inhabitants of the town, yet are limited to be members of certain religious societies.

The St. of 1869, *c.* 396, is unconstitutional and invalid, so far as it purports to authorize the town of Andover to raise by taxation and appropriate money to aid the trustees of the Punchard Free School to build a school-house " to be used and occupied in place of a high school for said town," and to aid in defraying the annual expenses of said school.

This court has not jurisdiction to restrain or regulate the proceedings of towns in granting and voting, under the Gen. Sts. *c.* 18, § 10, such sums as they judge necessary for burying grounds.

PETITION filed under the Gen. Sts. *c.* 18, § 79, by ten and more taxable inhabitants of Andover, for an injunction to restrain such officers and committees of the town as the court should order, and the trustees of the Punchard Free School in said town, from doing or attempting to do anything under or by virtue of the following votes passed at a town meeting July 6

1869, which votes the petitioners alleged to be in excess of the .awful authority of the town :

"*Voted*, That it is expedient that the town aid in rebuilding the Punchard Free School."

"*Voted*, That the town aid the trustees of the Punchard Free School in rebuilding their school-house recently destroyed by fire, to an amount not exceeding the sum of twenty-five thousand dollars, said aid to be furnished said trustees under the direction of a committee of five to be appointed by the selectmen, who shall see that the rights of the town in the property of said house be sufficiently secured."

"*Voted*, That the money hereby appropriated be raised by loan, and paid in instalments by taxation of not more than five thousand dollars and the interest in any one year, unless the town shall otherwise order."

"*Voted*, That the land owned by the town on the east side of the old railroad highway be designated as ' Mt. Carmel Cemetery,' and set apart for all time as a burial place for the dead of this town, and that the same be committed to the care of a committee of seven, to be chosen at this meeting, who shall be authorized to purchase the whole or a part of the adjoining lands, (alluded to " in a report made by a committee to the meeting,) " at an expense to the town not exceeding three thousand dollars."

"*Voted*, That they be authorized to draw their warrant on the town treasury for the necessary expenses to carry out the foregoing vote."

The defendants, in their answer, alleged that the votes, and all their acts done under or by reason of them, were lawful and valid. Issue was joined on the answer; an interlocutory injunction was granted ; and the case was heard by *Wells*, J. At the hearing, the petitioners offered to prove, as to the votes relating to the burying ground, " that nearly or quite fifty acres of land are to be appropriated to said cemetery, of the value of three thousand dollars ; that the population of said town is about six thousand inhabitants; that there are already in said town, inclusive of the Roman Catholic burial grounds, five places of pub-

lic burial, and a burial ground at the Theological Seminary that the costs of fencing said premises, making approaches and ways thereto, paths through the same, reducing it to such levels, and raising it in such elevations, with the other preparation and ornamental cultivation, as are usual and proper to cemeteries, will require an expenditure and taxation unreasonable and disproportionate; with other facts of a similar tendency." The judge ruled " that the facts, if proved as stated, would not render the proposed taxation for the purpose of a cemetery illegal," and that, so far as the bill related thereto, it could not be maintained. But he reported this ruling, and reserved the whole case for the determination of the full court; that part of the case arising on the votes relating to the Punchard Free School being reserved on the pleadings and a statement of agreed facts, the substance of all which appears in the opinion. No objection was taken to the bill for multifariousness.

*N. W. Hazen*, for the petitioners.

*A. A. Abbott*, for the respondents.

CHAPMAN, C. J.* 1. The principal object of the bill is to restrain the officers of the town of Andover from proceeding to raise money under a vote of the town relating to the Punchard Free School, which vote is alleged to be illegal because it is in violation of the eighteenth article of amendment in the Constitution, which is as follows: " All moneys raised by taxation in the towns and cities for the support of public schools, and all moneys which may be appropriated by the state for the support of common schools, shall be applied to, and expended in, no other schools than those which are conducted according to law, under the order and superintendence of the authorities of the town or city in which the money is to be expended; and such moneys shall never be appropriated to any religious sect for the maintenance exclusively of its own school."

In order to comprehend the spirit and intent of this article, it is necessary to advert to our early history. The founders of the colony appreciated the importance and necessity of providing

---

* This case was argued before all the judges but MORTON, J.

for the universal education of the people, at a very early period; and, to make it secure, they felt the necessity of placing it under the control of the people in each municipality. Accordingly the colonial act of 1647 required each town containing fifty householders to maintain a school in which the children should be taught to read and write; and each town containing one hundred householders to set up a grammar school, with a master able to instruct youth so far that they might be fitted for the university. The teachers were to be paid, "either by the parents or masters of the children, or by the inhabitants in general by way of supply, as the major part of those that order the prudentials of the town shall appoint." Anc. Chart. 186. Thus they laid the foundation of a system of common schools, which has been modified and improved from time to time, but has always retained its fundamental character and purpose. It provided free education in the elementary branches of learning to the children of every town, in schools to be managed and controlled by the authorities of the town, and supported by taxation of the inhabitants, unless sufficient contributions are received from other sources; and in the larger towns, which are sufficiently populous to make it desirable and reasonable, similar schools are to be maintained for the education of the more advanced pupils in higher branches of learning. The Constitution of the Commonwealth, part 2, *c.* 5, § 2, requires the legislature and the magistrates, among other things, to "cherish" "public schools and grammar schools in the towns," clearly referring to the schools above mentioned, and solemnly testifying to their importance in maintaining a system of popular government, which shall secure not only peace and order, but individual freedom and elevation of character.

"Public schools," as those words are used in the Constitution and laws of Massachusetts, are not limited to schools of the lowest grade. The addition of "grammar schools," in the article of the Constitution just quoted, is rather by way of specifying one kind of public schools, than by way of contradistinction. In the general laws of the Commonwealth, for years before the adoption of the eighteenth amendment of the Constitution, the

words " public schools " were used as including all schools, from those lower than grammar schools to those commonly known as high schools, established and maintained in the several cities and towns as part of the general system of popular education. All these are included under the head of " public schools" in the twenty-third chapter of the Revised Statutes. See also Rev. Sts. *c.* 23, §§ 10, 13, 62; Sts. 1838, *c.* 159, § 1; 1842, *c.* 42; 1849, *c.* 215, § 1; 1852, *cc.* 123, 240; 1854, *c.* 314. The words "public schools" are synonymous with " *common* schools," in the broadest sense, as used in this constitutional amendment, and in the statutes concerning the board of education and the distributions of the school fund. Sts. 1837, *c.* 241; 1849, *c.* 215. Rev. Sts. *c.* 11, § 13; *c.* 23, § 67. Sts. 1839, *c.* 56; 1840, *c.* 7; 1841, *c.* 17; 1846, *c.* 223; 1854, *c.* 300.

In *Cushing* v. *Newburyport,* 10 Met. 511, Chief Justice Shaw says : " The establishment of schools for the education, to some extent at least, of all the children of the whole people, is not the result of any recent enactment; it is not the growth even of our present constitutional government, or the provincial government which preceded it, but extends back two hundred years, to the early settlement of the colony. Indeed, the establishment of popular schools is understood to have been one of the objects for which powers were conferred on certain associations of persons living together in townships, enabling them to regulate and manage certain prudential concerns in which they had a common interest."

It was held in that case, that towns had power, under the Revised Statutes, then in force, to raise money by taxation for the support of other schools than the law required; the school in question being a girls' high school for the purpose of teaching bookkeeping, algebra, geometry, history, rhetoric, mental, moral and natural philosophy, botany, the Latin and French languages, and other higher branches of knowledge than were then taught in the grammar schools of the town. Yet the court was of opinion that schools supported by taxation must be town schools, and designed for the general education of all the people, and that what are understood by town schools must be determined

by an honest application of the rules of good sense in ascertaining the meaning of these well known terms, by long established and approved usage, and the well known policy of the legislature.

It is not necessary that these schools should be maintained by the inhabitants of a single town exclusively. The St. of 1848, *c.* 279, reënacted in Gen. Sts. *c.* 38, §§ 3 *et seq.*, authorized any two adjacent towns, having not more than two thousand inhabitants each, to form one high school district; and the Rev. Sts. *c.* 23, §§ 49–56, reënacted in the Gen. Sts. *c.* 39, §§ 42 *et seq.*, authorized contiguous school districts in adjoining towns to unite and form one district. See also St. 1868, *c.* 278. But such schools are of the same character with other town schools, in being established for the common benefit of the people of the towns, and kept under the control of the authorities of the towns; and the modifications are merely for the local accommodation of particular neighborhoods, or of the smaller towns.

Nor can the term "public schools" be confined to those supported exclusively by municipal taxation. Town schools have been for many years in part supported by legislative grants out of the school fund of the Commonwealth, as the constitutional amendment in question recognizes. Nor can they be limited to schools wholly supported by the public; for the original statute of 1647, as we have already seen, provided for the support of the schoolmaster, at the discretion of the selectmen, by a contribution from the parents of the scholars, or the masters of such as were under apprenticeship, instead of by a uniform tax upon all the inhabitants of the towns; and they may, in later times, derive support from voluntary contributions, as is shown by the provisions of the Rev. Sts. *c.* 23, § 64, which required the annual school returns from the towns to state what amount of money was raised by taxation, and what by voluntary contribution. See also *Allen* v. *School District in Westport,* 15 Pick. 35.

These are the schools to which the eighteenth article applies, — schools which towns are required to maintain, or authorized to maintain, though not required to do so, as a part of our system of common education, and which are open and free to all

the children and youth of the towns in which they are situated, who are of proper age or qualifications to attend them, or which adjoining towns may unite to support as a part of the same system ; and the article is evidence that experience had convinced the people of the necessity not only of preserving this system of common schools, but of guarding it against perversion and abuse, by means of an express constitutional provision.

This class of schools does not include private schools which are supported and managed by individuals ; nor colleges or academies organized and maintained under special charters for promoting the higher branches of learning, and not specially intended for, nor limited to, the inhabitants of a particular locality.

We now come to the consideration of the present case. Benjamin H. Punchard, an inhabitant of Andover, made the following bequest in his last will : " The residue of my property, not exceeding fifty thousand dollars, I give and bequeath to the town of Andover, for the purpose of founding a free school, forty thousand dollars for a permanent fund for the support of said school, and ten thousand dollars for the necessary buildings, &c., providing, that, at my decease, if there should not be the said amount of fifty thousand dollars, after paying the amounts first devised, then the said balance to be kept at interest till the amount is fifty thousand dollars. Said school shall be under the direction of eight trustees, of whom the rector of Christ Church to be one, also the ministers of the South Parish and West Parish Congregational Societies to be members also, the remaining five to be chosen by the inhabitants of Andover in town meeting, to serve for three years, two of whom to be taken from Christ Church Parish, two from the South Parish Society, and one from the West Parish Society ; said school to be free for all youths resident in Andover, under the restrictions of the trustees as to age and qualifications ; no sectarian influence to be used in the school, the Bible to be in daily use, and the Lord's prayer, in which the pupils shall join audibly with the teacher in the morning at the opening ; the said trustees to have the sole direction and power also to determine and decide whether the school shall be for males only, or for the benefit of

both sexes; said school to be located in the South Parish of Andover, but free to all the parishes equally."

The will was proved in 1850. The persons designated in it as trustees were incorporated by the St. of 1851, *c.* 7, and they have held the fund and established a school under this act. They built a school-house, which was in use till December 1868, when it was destroyed by fire. The St. of 1856, *c.* 77, passed upon the petition of several of the inhabitants of Andover, exempted the town from its obligation to maintain a high school after the opening of the Punchard Free School. The purpose was, that it should be to the people instead of a high school, such as our system of common education requires in such a town.

After the school-house was burned, the inhabitants, by vote passed in town meeting, procured the enactment on June 12, 1869, of the St. of 1869, *c.* 396. It authorizes the town to raise by taxation and appropriate twenty-five thousand dollars to aid the trustees of the school in erecting a school-house, to be used and occupied in place of a high school for the town; also to raise and appropriate annually a sum not exceeding two thousand dollars in any one year, to aid in defraying the annual expenses of the school.

This act provides that the town shall hereafter have the right to choose a majority of the board of trustees, and that the school shall be under the order and superintendence of the trustees, and they shall perform all the duties and exercise all the powers in relation to the school, now performed and exercised by the general school committee in relation to the public schools of the town; that the school shall be open at all reasonable times to the general inspection and examination of the general school committee, that they may ascertain its condition and management, and they shall include a report thereof in their annual report to the town. They shall also have the right to recommend for admission to the school such pupils of the public schools as they may deem qualified therefor.

But the school is not "under the order and superintendence of the authorities of the town." The will requires that it shall

be under the direction of eight trustees : three of them to be cler-
gymen of three of the religious societies in the town, and the
other five, though chosen by the inhabitants in town meeting, to
be members of those societies. All the other inhabitants of the
town are ineligible to the office of trustee ; and the authorities
of the town, as such, have no control over the school. It would
be inconsistent with the terms of the will to give them any
such control; and the terms of the act of 1869 are in careful
conformity with those of the will. If the school-house shall be
built, the legal title to it will be in the trustees, and they will
select the teachers, determine their compensation, and regulate
the school according to their own discretion, in conformity with
the directions of the testator. Yet money raised by taxation
of the inhabitants to maintain the school, or to build the school-
house, which is a mere incident of the school, will be, within the
intent of the eighteenth article, money raised for the support of
public schools ; because this school is designed to stand, for the
town of Andover, as a part of our system of common educa-
tion ; it is to be, for the children and youth of the town, the
high school or grammar school, and it is, by the very terms of
the statute of 1869, to be in place of a high school for the town ;
and, if maintained in whole or in part by taxation, it will prac-
tically exclude any other high school, and make it necessary for
those of them who desire free instruction in the higher branches
to resort to this school. If a school can possibly exist which
is not under the control of the town authorities, and yet can
be called a common or public school within the meaning of
the eighteenth article, this is such a school. The fact that it is
not under the control of the town authorities is its objectionable
feature, and constitutes the reason why moneys raised by taxa-
tion or appropriated by the Commonwealth for the support of
common schools cannot be applied to its support  This feature
constituted the principal reason why the town could not, under
the general laws, raise money by taxation for its support, but
found it necessary to procure a special act. But the act of th
legislature, though it might confer any constitutional authority
not contained in the general laws, could not confer a power

repugnant to the Constitution; and, so far as it purports to do it, is invalid; for legislative acts are themselves controlled and limited by the Constitution.

It is contended that the vote of the town is sustained by the decision in *Merrick* v. *Amherst*, 12 Allen, 500. The money raised by the town of Amherst was to be applied to aid the trustees of the Agricultural College in the erection of buildings; and the motive of the inhabitants was to induce the trustees to locate the college within the town. But the college was to form no part of the system of common education within the town. Its trustees resided elsewhere, and were not amenable to the town; its students were to come from other parts of the state, and from without the state, as freely as from Amherst; and its purpose was to teach special branches of learning. The institution was as distinct from the schools which belong to the system of common education, and which are contemplated by the eighteenth article, as any of the colleges or incorporated academies, or the school of technology. In discussing the question whether the town could, under a special act of the legislature, raise money by taxation to aid the trustees of that college, this was the point to which the attention of the court was directed; and it was not necessary to consider, so fully as it is in this case, what schools are, within the intent of that article, common or public schools. The question whether they must be wholly supported by taxation, or must of necessity be limited to a single town, did not arise. There is nothing in the decision of that case that tends to sanction the raising of money by taxation for the support of the Punchard Free School; and we think those of the inhabitants who object to being taxed for the support of this school are clearly entitled to restrain the town from raising money for that purpose. To hold otherwise would render the article nugatory as to one of its leading purposes.

2. The bill further seeks to restrain the town from purchasing land for a cemetery; alleging that it is to be such a cemetery as is contemplated by the Gen. Sts. *c.* 28; that it is unnecessary; and that the expense will be disproportionate and unreasonable. All objections to the bill for multifariousness are waived.

The language of the Gen. Sts. *c.* 18, § 10, authorizing towns to provide burial grounds,* is very broad, and leaves them to judge what sum shall be raised, what quantity of land shall be appropriated for the purpose, and how it shall be fenced, laid out, arranged and managed, without any specified restriction. There is no more jurisdiction conferred upon this court to regulate their proceedings, than there is in regard to the cost, number, size and style of school-houses to be built by a town. And towns are not prohibited in respect to burial grounds, any more than in respect to school-houses, from making them beautiful and attractive instead of unsightly and repulsive. The exercise of their judgment extends to matters of taste in respect to both.

The cemeteries mentioned in the Gen. Sts. *c.* 28, are owned by private corporations, the authorities of the town having but a limited control over them. The votes of the town do not show that a cemetery of this character was intended. In other respects, the words "burial ground" and "cemetery" seem to be used in the statutes synonymously.

*Injunction made perpetual as to raising money in aid of the Punchard Free School; and dissolved as to raising money for the cemetery.*

---

* "They may, at legal meetings, grant and vote such sums as they judge necessary for the following purposes : For the support of town schools ; . . . for burial grounds ; . . . ."