FIFTY-ONE HISPANIC RESIDENTS OF CHELSEA *vs.* SCHOOL
COMMITTEE OF CHELSEA (and a companion case[1]).

Suffolk. September 11, 1995. - January 5, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Chelsea. Constitutional Law*, Education, "Anti-aid" amendment, Use of
public money or property. *Education*, "Anti-aid" amendment. *Agency*,
Public agent, What constitutes. *Statute*, Construction, Validity.

Discussion of cases dealing with the meaning of the words "public agent."
[606-608]

Where a school committee exercised extensive supervisory control over a
university's management, under contract and pursuant to enabling leg-
islation filed as a home rule petition, of the municipality's public school
system, the university was a "public agent" within the meaning of the
anti-aid amendment, art. 103, § 2, of the Amendments to the Massa-
chusetts Constitution, with the result that the appropriation and use of
public money for the schools was not unconstitutional. [606-608]

A judge of the Superior Court correctly denied all parties' motions for
summary judgment with respect to a certain claim, reserving the mat-
ter for trial. [608-609]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 23, 1988.

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on June 13, 1989.

The second case was transferred to the Superior Court De-
partment by *Abrams*, J., where, on April 2, 1992, it was con-
solidated with the earlier case for trial.

The cases were heard by *Peter M. Lauriat*, J., on motions
for summary judgment, and, upon motion of the joint plain-

---

[1]President of Massachusetts Federation of Teachers & others *vs.* School
Committee of Chelsea & others.

tiffs, the cases were reported to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*Alan Jay Rom* (*Roger L. Rice* with him) for Fifty-one Hispanic Residents of Chelsea.

*Paul D. Wilson* (*Howard L. Greenspan & E. Peter Parker* with him) for Trustees of Boston University & others.

*Bruce A. Miller*, of Michigan, & *Jeffrey S. Jacobsen*, for Paul Devlin & others, were present but did not argue.

*Kristen Reasoner Apgar*, for the city of Chelsea, joined in a brief.

LYNCH, J. In the spring of 1989, Boston University (university) and the school committee of Chelsea (school committee) entered into an agreement whereby the university would participate in managing the Chelsea public school system. Pursuant to a clause in the agreement, its validity was contingent on Chelsea's board of aldermen and the Legislature's approving a home rule petition authorizing the arrangement. Art. 89, § 1, of the Amendments to the Massachusetts Constitution. The home rule petition was approved by the Legislature and signed by the Governor into law on June 13, 1989. St. 1989, c. 133 (enabling act).

On November 23, 1988, the president of the Massachusetts Federation of Teachers, an affiliate of the American Federation of Teachers, AFL-CIO, and others, commenced an action in the Suffolk Superior Court seeking a preliminary injunction to prevent the implementation of the agreement. On November 29, 1988, a Superior Court judge denied the motion for preliminary injunction as premature. Thereafter, the school committee and the university each moved to dismiss the action pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). These motions were denied by the judge on February 22, 1989.

On June 13, 1989, the day the Governor signed the enabling act into law, fifty-one Hispanic residents of Chelsea filed an action in this court, pursuant to the court's original jurisdiction. G. L. c. 214, § 2 (1994 ed.). G. L. c. 40, § 53 (1994 ed.). A single justice transferred the action to the Su-

perior Court, where, on April 2, 1992, it was consolidated with the earlier action. G. L. c. 211, § 4A (1994 ed.).

Thereafter, the school committee moved to dismiss and was joined by the university. The university moved for summary judgment and was joined by the school committee. The plaintiffs filed a joint cross motion for summary judgment. On July 27, 1994, another Superior Court judge allowed the defendants' motion to dismiss as to some of the claims and allowed the defendants' motion for summary judgment on all claims except for the "as-applied" unconstitutional delegation claim of the plaintiffs in the original complaint. This claim was reserved for trial. On motion of the joint plaintiffs, the judge thereafter reported both cases to the Appeals Court pursuant to G. L. c. 231, § 111 (1994 ed.), and Mass. R. Civ. P. 64, 365 Mass. 831 (1974). We granted the plaintiffs' application for direct appellate review.

The enabling act authorizes the school committee to enter into an agreement with the university whereby the university would manage the Chelsea public school system for a period not exceeding ten years.

Section 2 of the enabling act explains the purpose of the act.[2] The statute "declared and determined" that the public

---

[2]Section 2 of the enabling act provides in pertinent part:

"It is hereby declared and determined: that providing the best possible education to students in the public schools of the city of Chelsea and to the inhabitants of said city is the essential public purpose of the school committee; that the school system in said city currently offers unacceptably low levels of educational opportunity, as reflected by the poor performance of students on standardized tests, by the unacceptably high dropout rate of students and by the prevalence of functional illiteracy and academically and vocationally unprepared students in said city; that it is in the best interests of said city and its inhabitants to create new and expand existing educational opportunities in the school system so as to improve the academic performance of the students and to increase the general level of education among the inhabitants of said city; that the creation and expansion of educational opportunities within said school system would be significantly improved with the assistance of and under the direction of experts; that the university employs talented faculty and administrators who are experts in matters of educational policy and management, has particular knowledge of said school system gained by conducting a comprehensive study of said school system, has proven its ability, in a detailed report to

421 Mass. 598                                                    601

Fifty-One Hispanic Residents of Chelsea *v.* School Comm. of Chelsea.

school system in Chelsea "currently offers unacceptably low levels of educational opportunity," and the university is "uniquely qualified to help the school committee make significant improvements in the educational opportunities offered" in the Chelsea public schools. The university had originally been working with the school committee as a consultant and had provided the school committee with a detailed report on the schools in May of 1988, which included practical suggestions on how to improve the system. The implementation of the agreement between the school committee and the university was determined by the enabling act to be in the best interests of Chelsea, its inhabitants, its school system, and its students.

The enabling act makes special provisions for the university and the school committee regarding open meetings, public records, and audits, explicitly overriding other General Laws or any special law traditionally governing public schools.[3] Section 5 of the enabling act provides that the Inspector General shall continue to audit all public funds used

---

the school committee, to identify the problems faced by said school system and to make specific and practical recommendations for capitalizing on the strengths and eliminating the weaknesses of said school system so that it may solve those problems, and thus is uniquely qualified to help the school committee make significant improvements in the educational opportunities offered by said school system and in the academic performance of students within said system . . . ."

[3]Section 3 of the enabling act provides:

"Notwithstanding any provision of any general or special law to the contrary, including without limitation the provisions of chapter seventy-one of the General Laws, and notwithstanding any provision of the city's charter to the contrary, the school committee is hereby authorized to enter into an agreement with the university, which may be subject to amendment by the parties from time to time and which shall be subject to termination by the school committee upon reasonable notice, under which (i) the school committee shall delegate to the university some or all of its legal duties, powers and functions, on such terms and subject to such conditions, controls, standards and procedures as the school committee may determine to be appropriate to ensure that the public purposes of the agreement and this act are carried out, and (ii) the university shall act for, on behalf of and in the name and stead of the school committee, in the manner set forth in such agreement, in exercising the duties, powers and functions which are so delegated. Any such agreement may provide that no votes of the school com-

to operate the Chelsea public schools.[4] Section 6 of the enabling act requires that all final decisions of the university be made in an open meeting if the school committee would have been required to do so.[5] Section 7 of the enabling act allows school employees and their union access to the university's internal memoranda if used in connection with a tenure decision or suspension, promotion, demotion, or dismissal of an employee.[6]

mittee shall be required in connection with the exercise of any such powers. The term of any such agreement shall not exceed ten years."

[4]Section 5 of the enabling act provides:

"This act shall not be construed or interpreted to limit the authority of any public official otherwise authorized to conduct an audit of the public funds of the city or of the school committee, but neither shall this act be construed or interpreted to extend the authority of any such official to conduct an audit of any private funds of the university. The provisions of chapter twelve A of the General Laws shall not apply to any undertaking by the university or any of its officers, trustees, employees or agents pursuant to the provisions of this act, unless, and to the extent, any such undertaking shall be financed by funds received by the city, or an officer or department thereof, in accordance with the provision of section fifty-three or section fifty-three A of chapter forty-four of the General Laws."

[5]Section 6 of the enabling act provides:

"For the purposes of sections twenty-three A to twenty-three C, inclusive, of chapter thirty-nine of the General Laws and in connection with any undertaking by the university or any of its officers, trustees, employees or agents pursuant to the provision of this act, no group of officers, trustees, employees or agents of the university shall be deemed to constitute a governmental body; provided, however, that all final decisions of the university acting pursuant to powers delegated by the school committee, which decisions, if made by the school committee directly, would be required to be made in an open meeting pursuant to said chapter thirty-nine, shall be made at a meeting open to the public conducted by one or more authorized representatives of the university. Except in an emergency, notice of any such meeting shall be filed with the clerk of the city, and the notice or a copy thereof shall be publicly posted in the office of said clerk or on the principal official bulletin board of the city at least forty-eight hours prior to such meeting, including Saturdays but not including Sundays."

[6]Section 7 of the enabling act provides in pertinent part:

"[N]o book, paper, map, photograph, recorded tape, financial statement, statistical tabulation or other documentary materials or data made or received by any officer, trustee, employee or agent of the university shall be deemed to be a public record by virtue of having been so made or received, unless, and to the extent, any such record contains or describes (i) a final

421 Mass. 598                                                                 603

Fifty-One Hispanic Residents of Chelsea *v.* School Comm. of Chelsea.

The university is obligated by the agreement to make timely reports to the school committee, and the school committee has the right to review: educational policies; the annual budget; collective bargaining agreements; and the appointment of certain employees. The school committee also retains the right to override the university on these issues with a two-thirds vote. Most significantly, the school committee retains the power, by majority vote, to terminate the agreement with the university at any time.[7]

policy decision or position or (ii) a recommendation presented for action at an open meeting described in section six of this act. . . . [A]ny such memorandum or correspondence, to the extent used in connection with a decision relating to tenure, suspension, promotion, demotion or dismissal of an employee of the school system, shall be made available to such employee and to any organization representing such employee pursuant to said chapter one hundred and fifty E; and, provided further, that nothing in the act is intended to impair or limit the access of any individual or organization to records maintained in the city by the school committee or the superintendent of schools."

[7]Section E of the agreement states:

"E. *School Committee Retained Powers*

"In addition to its right to terminate this agreement, the School Committee, during the term of this agreement, shall have the right and retained authority to:

"1. Receive Timely Reports:

"The School Committee shall receive timely reports from the University on the status of the school system, implementation of this agreement as set forth above, and on such matters as it may from time to time reasonably request. The University will file a monthly report with the Clerk of the School Committee on the Monday preceding the fourth Thursday of each month. The University may file additional reports with the Clerk at any time.

"2. Require Reconsideration:

"During the term of this agreement, the School Committee shall have the power to review and, by majority vote of the whole number of seats of the School committee, require the reconsideration by the University of (i) the adoption of educational policies affecting the school system as a whole, including substantial revisions to the content or timetable for implementation of the educational program provided for under this agreement, (ii) the adoption and submission of the annual budget, (iii) the adoption of a collective bargaining agreement negotiated with the collective bargaining representative of employees of the School Committee, and (iv) new appointments of employees in 'Unit B' (including principals, headmasters, assistant principals, submasters and others in the Unit) or of a Superintendent of Schools.

Many issues raised in the complaint were not raised on appeal and are therefore waived.[8] See Mass. R. A. P. 16 (a)

"Such reconsideration shall be initiated by said majority vote of the School Committee taken not later than ten business days following receipt by the Chairman or Clerk of the School Committee of a report from the University on the action or proposal which is the subject of the reconsideration. Upon receipt of notice of such vote having been adopted, the University shall reconsider the action and shall thereafter report to the School Committee its decision after reconsideration, which decision shall be final except as to any matter made subject to override by the School Committee by the provisions of Section E.3 of this agreement.

"The University agrees that, except for emergency situations, the University will not implement major changes in policy or program prior to the time the School Committee has had an opportunity to review the proposal in accordance with this section E of the agreement.

"3. Override:

"The School Committee, acting by two-thirds vote of the number of members eligible to vote on such matters, shall have the power to override acts of the University regarding (i) the adoption of educational policies affecting the school system as a whole, including substantial revisions to the content or timetable for implementation of the educational program provided for under this agreement, (ii) the adoption and submission of the annual budget, and (iii) the adoption of a collective bargaining agreement negotiated with the collective bargaining representative of employees of the School Committee; provided that not less than four votes in favor of such override shall be required for any such vote to be effective.

"Such vote shall be taken not later than ten business days following receipt by the Chairman or Clerk of the School Committee of a written report from the University on its reconsideration of the action or proposal in question."

Section H (3) of the agreement states: "Subject to paragraphs 2 and 5 of this Section H, the school committee may terminate this agreement without cause by vote of a majority of the total number of seats on the Committee."

Paragraph 2 is entitled "Procedures to facilitate continuation of the agreement."

Paragraph 5 is entitled "Effect of Termination."

[8]In this opinion we address the alleged constitutional violation of the anti-aid amendment and the nondelegation claim. The following issues were addressed in the Superior Court, but were not briefed on appeal: (1) The university's management of the school violated the home rule amendment, art. 89, § 1, of the Amendments to the Massachusetts Constitution; (2) the procedure by which the enabling act was adopted did not comply with the home rule amendment, the Chelsea city charter, and the rules of the school committee; (3) the university's management of the Chelsea public schools violated the equal protection rights under the Massachusetts Constitution of the citizens of Chelsea; (4) the contract and en-

421 Mass. 598                                                605

Fifty-One Hispanic Residents of Chelsea *v.* School Comm. of Chelsea.

(4), as amended, 367 Mass. 921 (1975). The primary issue before us concerns the constitutionality of the enabling act and agreement under art. 103, § 2, of the Amendments to the Massachusetts Constitution.[9] An additional issue is whether the judge erred when he reserved the plaintiffs' "as-applied" nondelegation claim for trial. We agree with the judge that the enabling act does not violate the anti-aid amendment and that the "as-applied" claim was properly held for trial.

Article 46, § 2, of the Amendments to the Massachusetts Constitution, as it was rewritten in 1974 by art. 103 of the Amendments, provides in pertinent part:

> "No grant, appropriation or use of public money or property or loan of credit shall be made or authorized by the Commonwealth . . . for the purpose of founding, maintaining or aiding any . . . primary or secondary school . . . which is not publicly owned and under the exclusive control, order and supervision of public officers

---

abling act improperly exempt the university from a variety of statutes, including those pertaining to open meetings and public records, personnel records and collective bargaining information, tort liability, indemnification, and public audits; (5) the transitional bilingual education act has been violated.

[9]Article 103, § 2, of the Amendments to the Massachusetts Constitution provides:

"No grant, appropriation or use of public money or property or loan of credit shall be made or authorized by the Commonwealth or any political subdivision thereof for the purpose of founding, maintaining or aiding any infirmary, hospital, institution, primary or secondary school, or charitable or religious undertaking which is not publicly owned and under the exclusive control, order and supervision of public officers or public agents authorized by the Commonwealth or federal authority or both, except that appropriations may be made for the maintenance and support of the Soldiers' Home in Massachusetts and for free public libraries in any city or town, and to carry out legal obligations, if any, already entered into; and no such grant, appropriation or use of public money or property or loan of public credit shall be made or authorized for the purpose of founding, maintaining or aiding any church, religious denomination or society. Nothing herein contained shall be construed to prevent the Commonwealth from making grants-in-aid to private higher educational institutions or to students or parents or guardians of students attending such institutions."

or public agents authorized by the Commonwealth
. . . ."

Constitutional analysis begins with a presumption of statutory validity. See *Commonwealth* v. *School Comm. of Springfield*, 382 Mass. 665, 674 (1981). The party attacking the legislation bears the heavy burden of proving the absence of any conceivable basis on which the statute may be supported. See, e.g., *id.* at 675, citing *Jewel Cos.* v. *Burlington*, 365 Mass. 274, 277-278 (1974).

The plaintiffs contend that the enabling act and agreement run afoul of the provisions of the anti-aid amendment set out above. There is no question that the schools in Chelsea are "publicly owned," and the plaintiffs do not contend otherwise. See G. L. c. 71, § 37 (1994 ed.). It is just as clear that the members of the school committee of Chelsea are public officers. *Id.* See *Sweeney* v. *Boston*, 309 Mass. 106, 108 (1941). Thus, if under the enabling act and the agreement the university is a public agent authorized by the Commonwealth, the agreement does not offend the anti-aid amendment because the schools are publicly owned and under the control of either public officers or public agents authorized by the Commonwealth.

1. *The university as public agent.* The principal focus of the motion judge's decision and of the defendants' arguments in support of it is on the status of the university as a public agent. There is nothing in the concept of public agent that precludes a private university from performing as an agent of the public. If it does so in this case, then the school system is under the control, order, and supervision of public officers or public agents authorized by the Commonwealth. The anti-aid amendment's purpose is served if the required control, order, and supervision are shared jointly but exclusively by public officers and public agents. The crucial question is, therefore, whether the university is acting as the agent of a public entity.

There are few opinions that deal with the meaning of the words "public agent." There are two, however, relied on by

421 Mass. 598                                                        607

Fifty-One Hispanic Residents of Chelsea v. School Comm. of Chelsea.

the plaintiffs, that deserve discussion. In *Jenkins* v. *Andover*,
103 Mass. 94 (1869), the court dealt with art. 18 of the
Amendments to the Constitution of the Commonwealth in its
original form, and not as approved by the voters in 1917,
1972, and 1974. The original amendment required that any
school for which public funds were to be expended had to be
under the order and superintendence of the municipal au-
thorities. The court held that a school under the direction of
independent trustees was not under the control of municipal
authorities and that public funds could not be used to sup-
port the school. *Id.* at 102. In the *Jenkins* case, there was
none of the incidents of control and supervision that the
school committee has pursuant to the enabling statute and
pursuant to the agreement between it and the university. For
the purposes of determining the right to control, and hence
agency, the absence of such incidents in the *Jenkins* case and
their presence in the case now before the court are crucial.

In *Adams* v. *Plunkett*, 274 Mass. 453 (1931), in dictum,
the court considered the provisions of art. 18, superseded by
art. 45 of the Amendments to the Constitution in 1917, and
then specifically discussed the status of trustees of a publicly-
owned hospital maintained by the town of Adams pursuant
to a gift accepted by the town. The trustees had "exclusive
control, order and superintendence" of the hospital subject to
the terms of the gift and general public law. The court said
"these trustees constitute 'public officers or public agents.' "
*Id.* at 465. The court considered that the trustees were ad-
ministering a public trust, performing public duties for defi-
nite purposes solely for the benefit of the public. *Id.* at 462.
The *Adams* opinion concluded that town funds could be
expended, without violating the anti-aid amendment, for an
institution not under the supervision of any town official or
agent (other than the trustees themselves) whose administra-
tors were governed by the terms of a gift and by duties im-
posed by law. That holding certainly provides the plaintiffs
before us no assistance and suggests that, where by law, stat-
utory or otherwise, an entity is regulated as to its perform-

ance of some public obligation, the entity can be a public official or public agent.

The extensive supervisory controls that the school committee has over the university's performance of the city's educational obligations represents that kind of control, or more precisely right to control, that is an essential part of an agency relationship. Restatement (Second) of Agency § 1 (1958). The university's agency is a public one because the university as an agent is fulfilling a public obligation, i.e., education of the youth of the city, *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 620-621 (1993), while subject to the control of a public entity as a principal, all pursuant both to its legislatively authorized contract and to the enabling act. The university is, therefore, a public agent for the purposes of the anti-aid amendment.

2. *Delegation.* The plaintiffs argue that the school committee has unconstitutionally delegated its powers to a private entity. What we have said in the preceding section of this opinion disposes of this argument. The university is a public agent authorized by the Commonwealth to perform under the agreement.

3. *"As applied" claims.* The plaintiffs claim that it was error for the judge to reserve for trial the "as applied" claims of the plaintiffs in the original action. In support of this argument on appeal the plaintiffs rely primarily on the affidavit of a former member of the school committee who last served in December, 1991. The affidavit contains a recitation of her experiences while serving on the committee and her opinion on the efficacy of the controls over the conduct of the university. Even if we take the allegations of this affidavit as true for summary judgment purposes, it does not establish that the control of the school committee is illusory or that it has abdicated its responsibility under the enabling act and agreement.

Furthermore, the plaintiffs' standing to claim that the university is not supplying adequate reports pursuant to the agreement is questionable.

The judge correctly reserved the plaintiffs' "as-applied" claims for trial. The affidavits presented do not support any legal theory on which summary judgment could be based.

We conclude that the school committee has retained control of the Chelsea public schools, directly or through the university, which is a public agent authorized by the Commonwealth. The arrangement between the school committee and the university does not offend the anti-aid amendment.

*Judgments affirmed.*